IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| Deloitte Tax LLP, | ) | CASE NO. _____ |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | **COMPLAINT** |
| vs. | ) | **(JURY DEMAND ENDORSED HEREON)** |
|  | ) |  |
| Austin Murray, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

Plaintiff DELOITTE TAX LLP ("Deloitte Tax" or "Plaintiff"), through its undersigned attorneys, hereby pleads by and for its Complaint against Defendant AUSTIN MURRAY ("Murray" or "Defendant") as follows:

1.      This action is brought to address harms caused by a disloyal former employee, Defendant Austin Murray.  Murray, while employed by Deloitte Tax and in contravention of the terms of his employment, secretly formed a start-up company and built a software tool that purports to perform the very same reverse audit analyses as Deloitte Tax and its innovative "CogTax" software tool – a product unique in the marketplace that was developed at great effort and expense by Deloitte Tax.  During his employment at Deloitte Tax, Defendant had access to confidential and proprietary information concerning the creation, marketing and operation of the CogTax tool.  Defendant was obliged to keep such information confidential and not to use it for any purposes other than those authorized by Deloitte Tax.  Defendant breached those obligations, among others.

2.     Despite Deloitte Tax's reasonable and repeated efforts to investigate this matter and address it without the need for formal proceedings, Defendant has steadfastly refused to comply with his express contractual obligations to allow inspection by Deloitte Tax of his personal and home electronic devices, refused to acknowledge Deloitte Tax's ownership rights to his derivative works, and refused to follow basic rules of fair competition, even taking the further step of falsely advertising his copycat tool and causing Deloitte Tax further damage.

3.     This is an action for damages and specific performance related to Defendant's breach of contract, breach of an employee's duty of loyalty, trade secret misappropriation, and false advertising under the Lanham Act, 15 U.S.C. § 1125, arising from Defendant's employment with Deloitte Tax, his misconduct during his employment, post-termination rights springing from his employment agreement, and his false advertising of his new company's competing reverse audit software tool.

4.     Plaintiff is a limited liability partnership formed under the laws of Delaware with its principal place of business in New York, New York.

5.     Defendant is an individual who, during his employment with Deloitte Tax and, upon information and belief, through the date of this filing, is and was a resident of Ohio living in Cleveland Heights, Cuyahoga County.

6.     Jurisdiction is proper in this court pursuant to 15 U.S.C. § 1121(a), and 28 U.S.C. § 1331, in that this Complaint raises federal questions under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). Supplemental jurisdiction over the state law claims is proper in this court pursuant to 28 U.S.C. § 1367.

7.     Personal jurisdiction over Defendant is proper because he was, at the operative times described in this Complaint, and upon information and belief remains, an Ohio resident,

registered to vote and residing in Cuyahoga County, Ohio.  Alternatively, long-arm jurisdiction is appropriate under at least Ohio Rev. Code Ann. §2307.382(A)(1), in that the causes of action in this Complaint arise from Defendant's breach of a contract performed in Ohio and his activities in this district establishing and promoting a company based in this district.

8.      Venue is proper in this district under 28 U.S.C. §1391(b)(1)-(3) in that Defendant is or was at all relevant times a resident of Cuyahoga County, a substantial portion of the events that are the subject of this action took place in this district, and he is subject to personal jurisdiction in this district.

**Deloitte Tax's Innovative CogTax Tool**

9.      Deloitte Tax provides various tax services to clients.  Among those services are "reverse audits," which are undertaken by tax advisors for the purpose of identifying indirect tax underpayments and overpayments and other potential savings available to companies.  At Deloitte Tax, those services are typically provided through Deloitte Tax's MultiState Tax Services group.

10.     From approximately 2015 through approximately 2017, with the help of an affiliate, Deloitte Tax spent thousands of hours developing a software tool that changed the way indirect tax services are performed and revolutionized the way reverse audits can be conducted.  That software tool is known as CognitiveTax Insight or "CogTax".

11.     CogTax is highly proprietary to Deloitte Tax and was produced at great expense and effort.  At a high level, CogTax uses machine learning to identify sales and use tax over-payments and under-payments, saving clients time and money in the reverse audit process and offering them a solution to proactively identify issues in order to obviate or reduce the need for time consuming manual reverse audits.

12.　　More specifically, the CogTax tool imports raw client data from structured sources (e.g. General Ledger, Accounts Payable, Electronic Data Interchange) and non-structured data (e.g., invoices, purchase orders, contracts) using "Smart OCR" (object character recognition), cleanses it through consolidation and data mapping, identifies and validates taxability determinations, and provides interactive and predictive insights.  Deloitte Tax can feed thousands of invoices into the CogTax tool and within days, or often hours, can quickly and accurately analyze refund potential and exposure/liability. It is unique in the market because it uses artificial intelligence (machine learning) to provide, among other insights, a pre-review degree of prediction as to the measure of accuracy (*e.g*., confidence level), which assists a knowledgeable user (*i.e*., a Deloitte Tax professional) assess the taxability determination generated by the tool – a feature which has set Deloitte Tax apart from others in this highly competitive market.  Until Defendant improperly launched his own company, Prophit.ai, there was no other solution like CogTax in the market.

13.　　CogTax transforms the way in which Deloitte Tax professionals advise clients about their indirect tax recovery needs — migrating from a periodic retroactive refund review to a more real-time, active analysis of a company's indirect tax determinations to eliminate overpayment of tax before it occurs.

14.　　Deloitte Tax is continuously updating CogTax, for example, to innovate its processing, to tailor reporting dashboards in response to client/user feedback, and to update relevant tax code changes across multiple jurisdictions.

15.　　In October 2018, Deloitte Tax was recognized by International Tax Review as the Americas Tax Technology Firm of the Year in part for its technological innovation of CogTax.

16.    Deloitte Tax maintains the proprietary nature of CogTax by, among other things, limiting access (by physical and technological means) to the tool only to those authorized by Deloitte Tax to use the software and limiting access (by physical and technological means) to details about the software code, architecture and algorithms used in the tool to those employees having a need to know that information.  Deloitte Tax also takes steps to ensure that all Deloitte Tax employees are legally obligated to keep company information confidential by means of confidentiality agreements and clearly-stated company policies.

**Defendant Austin Murray's Employment with Deloitte Tax**

17.    Defendant graduated from the University of Akron School of Law in 2011 and became a member of the Ohio bar in November 2014.

18.    Upon information and belief, Murray has been employed in the financial services field since February 2013.

19.    Prior to being employed by Deloitte Tax, Murray worked for a competitor of Deloitte Tax.  Upon information and belief, Murray did not have any prior experience using a solution that utilized machine learning to assist in performing reverse audits.

20.    In pursuing his employment at Deloitte Tax, Murray described himself in a January 2018 email to Deloitte Tax practitioners as "an attorney with a hobby" and admitted that although he had "studied computer science a decade ago in undergrad" he lacked experience with effective machine learning indirect tax applications. Indeed, Murray admitted that, until he heard a Deloitte Tax presentation in January 2018, he "didn't know what "RPA" or "ETL"" (two core machine learning terms) were.  At the same time, Murray promoted himself to Deloitte Tax as a lawyer who understood tax codes and software code.

21.     On February 26, 2018, in acceptance of and as consideration for Deloitte Tax's offer of employment as a manager in its MultiState Tax Services group, Murray signed a Management-Level Employee Agreement ("Employment Agreement") with Deloitte Tax.

22.     In addition to describing more general terms of his employment, the Employment Agreement set out Murray's obligations as an employee of Deloitte Tax.  These obligations are critical to the employer/employee relationship.  They speak directly to the trust and reliance that an employer must be able to place in an employee for the employment relationship to function properly.  Several provisions of the Employment Agreement are directly relevant to this lawsuit.

23.     In Paragraph 4 of the Employment Agreement, Murray acknowledged that he would have access to confidential information during the course of his employment and he expressly agreed not to "use any such *Confidential Information* for any purpose other than for the benefit of a *Deloitte Entity*."

24.     In Paragraph 6 of the Employment Agreement, Murray agreed that during his employment he would not participate in or provide services to any entity competing with Deloitte Tax:

> During the period of my *Employment* I will not, directly or indirectly, participate in or in any way render services or assistance to any business that is or may be competitive with a *Deloitte Entity*, whether or not for compensation, or engage in any conduct which might result in, or create the appearance of using my position for private gain or other than for the benefit of a *Deloitte Entity*, or otherwise create a conflict, or the appearance of a conflict, of interest with a *Deloitte Entity*. Such conduct shall include, but not be limited to…having an undisclosed relationship with a family member or other individual who is employed or associated with any entity in active or potential competition with a *Deloitte Entity*, and which creates a conflict of interest. I represent and warrant that I am not currently aware of any present or past violation of this provision.

25.     In Paragraph 7(c) of the Employment Agreement, Murray further agreed not to access Deloitte Tax's electronic systems to obtain information to assist a competitor:

I further acknowledge that I am not authorized to access the Systems for personal gain or any illegal or unethical use. I agree that under no circumstances am I authorized to access any of the *Systems* for the purpose of obtaining *Deloitte Property* for a competitor of a *Deloitte Entity*, transmitting *Deloitte Property* to me (e.g., emailing *Confidential Information* to my personal email address) or to a third party for purposes other than furthering the business objectives of a *Deloitte Entity*. I am not authorized to access the Systems to download a *Deloitte Entity's* Confidential Information or other *Deloitte Property* to removable media such as a CD Rom, disk or thumb drive other than as authorized for furthering the business objectives of a *Deloitte Entity*.

26.     In Paragraph 8(a) of the Employment Agreement, Murray agreed that Deloitte Tax

"owns all rights, title, and interest in and to all *Works*."

27.     In Paragraph 8(b) of the Employment Agreement, Murray agreed that all *Works*

were owned or to be assigned to Deloitte Tax, and, in Paragraph 8(d) that:

During a 12 month period after termination of my *Employment*, I agree that any *Intellectual Property* I create or conceive that results from and is related to any work assigned to or performed by me for the *Employer*, or that was created using *Deloitte Property*, is a *Work* that is subject to Paragraph 8(b) above. For purposes of clarification, the foregoing provision is in addition to, and not in limitation of, any rights and remedies the *Employer* may have under the applicable laws protecting *Intellectual Property* of the *Deloitte Entities*.

28.     The Employment Agreement defines a "*Work*" as:

[A]ll *Intellectual Property*, in any *Form*, created by me, alone or with other others, during the period of my *Employment* that (1) is created within the scope of my *Employment*; (2) relates in any manner to the actual or anticipated business, research, or development of a *Deloitte Entity*; (3) results from any work assigned to or performed by me, alone or with others, for the *Employer*; or (4) is created with the use of *Deloitte Property*.

29.     Paragraph 9 of the Employment Agreement required Murray to disclose any pre-

existing *Intellectual Property*, defined to include any "works of authorship (including, without

limitation, books, articles, data compilations, software and other copyrightable materials),

materials, patents, inventions, designs, techniques, methodologies, processes, discoveries, know-

how, ideas, trade secrets, moral rights, trademarks and other indicia of origin together with the

goodwill therein, and all patent applications, copyright and trademark applications and registrations, and extensions and renewals thereof, throughout the world".

30.     Murray did not identify any pre-existing intellectual property to Deloitte Tax when he executed the Employment Agreement.

31.     Murray further agreed, in Paragraph 10 of the Employment Agreement, to refrain from soliciting or providing services to clients and prospective clients with which he was involved during his last two years of employment with Deloitte Tax for a period of one year following termination of his employment.

32.     In Paragraph 13 of the Employment Agreement, Murray agreed not to solicit, hire, or retain personnel from Deloitte Tax during his employment or for a year thereafter:

> I acknowledge that, because of the nature of my work for a *Deloitte Entity*, my solicitation, hiring or retention of any of its *Personnel*…or my participation in their hiring, admission or retention would necessarily involve the unauthorized use or disclosure of *Confidential Information* or the proprietary relationships and goodwill of the *Deloitte Entities*. Accordingly, during my *Employment* and for one year thereafter, I will not, directly or indirectly, (a) solicit or attempt to solicit, or participate in the solicitation of or any attempt to solicit any *Personnel* to leave a *Deloitte Entity*, or to join any firm or business with which I may be or become affiliated, (b) participate in the hiring or admission of any *Personnel*….

33.     In Paragraph 14 of the Employment Agreement, Murray agreed to return all Deloitte Tax property, including intellectual property, upon the termination of his employment and to permit inspection of his own personal electronic devices to ensure that he had done so:

> Upon termination of my *Employment*: (a) I will not use or disclose *Deloitte Property*, including, but not limited to, *Confidential Information* and *Works*, for any purpose; (b) I will not retain or take with me any Deloitte Property; (c) I will immediately deliver to a *Deloitte Entity* at any location that it designates, at my expense, within five (5) business days after the termination of my *Employment* or on an alternate date designated by a *Deloitte Entity*, any *Deloitte Property* that I may then or thereafter hold or control; and (d) I agree, upon request from a *Deloitte Entity* that is based on its reasonable belief that I may have *Deloitte Property* in electronic form in my possession, custody or control, to allow a *Deloitte Entity* to inspect any of my personal or home computers, including smart phones, or tablet computers, or any device, media, or location capable of storing electronic data, to

determine whether any *Deloitte Property* resides on such computers, devices, media or locations and to permit a *Deloitte Entity* to remove such *Deloitte Property*.

34. Murray agreed, in Paragraph 19 of the Employment Agreement, that any breach by him of Paragraphs 4, 5, 6, 7, 8, 9, 10, 12, 13, and 14 of the Employment Agreement would entitle Deloitte Tax to injunctive relief and payment of Deloitte Tax's reasonable costs and attorney's fees incurred in enforcing the Employment Agreement.

35. In Paragraph 22 of the Employment Agreement, Murray agreed:

[…to permit the *Employer* (or to use my best efforts to enable the *Employer*) to inspect my books and records (and the books and records of any entity which employs or is associated or affiliated with me), upon request and at reasonable times, to enable the *Employer*…to verify compliance with Paragraphs 10 and 13. The *Employer* shall keep confidential any proprietary information obtained, except as may be necessary or desirable to enable the *Employer* to enforce its rights under this Agreement and except as may be required by any statute, court or administrative order to decree or government ruling or regulation.

36. By signing the Employment Agreement on February 26, 2018, Murray stated that he had "read the foregoing, understand it, and agree to comply with its terms."

37. While employed by Deloitte Tax, Murray had direct access to non-public information concerning Deloitte Tax's CogTax product. In addition to being an integral part of client sales presentations, Murray acted as a liaison between Deloitte Tax's customer-facing team and its data scientists working on enhancing the CogTax product. Thus, Murray was uniquely postured to receive propriety information as well as information relating to customer feedback, technical and user-interface issues, and similar confidential information of great value.

38. Through his employment at Deloitte Tax and the trust that Deloitte Tax placed in him, Murray received in-depth knowledge regarding the architecture, functionality, proprietary algorithm, and detailed user preferences behind CogTax.

39.     In addition, Murray gained knowledge of confidential information related to the customers to whom Deloitte Tax was currently pitching CogTax and prospective clients whom it intended to approach for purposes of exploring a business relationship.

**Defendant Murray Leaves Deloitte Tax under False Pretenses**

40.     On or about October 7, 2019, Murray informed Deloitte Tax that he was leaving Deloitte Tax.  He told his superiors that he was leaving to join a "FinTech" company (a technology company focusing on the financial industry).

41.     Murray's representation as to the reason for his departure was false.  He was not leaving Deloitte Tax to join a FinTech company.  Rather, unbeknownst to Deloitte Tax, he was already working as the "founder" of a company called Prophit.ai, Inc. ("Prophit.ai"), which (falsely) advertises itself as "the only company offering machine learning software that corrects tax over- and underpayments proactively." On its LinkedIn profile, first used in August 2019 to advertise the company, Prophit.ai claims:

> Prophit.ai develops machine learning solutions for sales and use tax decision making. Our technology allows us to perform reverse audits 50x faster, and helps clients maintain compliance by solving the taxability problem during purchasing.

42.     As Deloitte Tax later learned, and as described further below, Prophit.ai was founded by Murray and some colleagues by the summer of 2019 – *while Murray was still employed by Deloitte Tax* and during a period when he was directly exposed to highly valuable and proprietary information about Deloitte Tax's CogTax product.  During his employment, Murray never disclosed to Deloitte Tax the fact that he and his colleagues founded Prophit.ai and were working on a competing software platform.

43.     If Deloitte Tax had been informed that Murray intended to start (or, in fact, had already started) a company that competed directly with Deloitte Tax, it would immediately have taken steps to deny Murray further access to clients and to Deloitte Tax confidential information,

including information about CogTax and Deloitte Tax clients and prospective clients. By concealing his new start-up from Deloitte Tax, Murray continued to obtain highly proprietary information from Deloitte Tax and surreptitiously facilitated his own improper use of such information for purposes wholly inconsistent with his employment agreement.

44.     If Deloitte Tax had been informed that Murray intended to start (or, in fact, had already started) a company that competed directly with Deloitte Tax, it would have engaged in a thorough inspection of his digital devices while he was still employed by Deloitte Tax as it was permitted to do under Paragraph 7 of the Employment Agreement. Having been deceived by Murray, Deloitte Tax was unable to take that step.

45.     On November 4, 2019, in preparation for his imminent departure from Deloitte Tax, Murray certified that he had complied with the Employment Agreement. As set forth below, that certification was false; Murray was, and had been, breaching multiple terms of the Employment Agreement for several months.

46.     Murray's last day of employment at Deloitte Tax was November 7, 2019.

**Deloitte Tax's Discovery of Prophit.ai**

47.     In February 2020, Deloitte Tax first learned that Murray founded Prophit.ai when he was still employed by Deloitte Tax.

48.     Murray identifies himself on the FS6.com networking website for start-ups as a co-founder and the CEO of Prophit.ai and, upon information and belief, he is one of two owners/employees of the company.

49.     The Prophit.ai domain name was registered (anonymously) in May 2018, underline shortly after Murray started his employment with Deloitte Tax.

50.     According to the records of the Ohio Secretary of State, Prophit.ai was officially formed in August 2019, while Murray was employed by Deloitte Tax.

51.     However, work on Prophit.ai apparently began earlier than its official formation, since according to the Facebook profile of Murray's co-founder, Rob van Haaren, Prophit.ai was founded in the first part of June 2019.

52.     Upon information and belief, Mr. van Haaren has no background in state tax law or indirect tax refunds or any other aspect of this highly complicated area. Upon further information and belief, until Mr. van Haaren started at Prophit.ai in June 2019, he was working in the solar energy field using his earth and environmental engineering background.  Deloitte Tax has no reason to believe that Mr. van Haaren had any connection to, or knowledge of, indirect taxes or reverse audit software prior to joining Prophit.ai.

53.     Defendant Murray's multiple breaches of his employment agreement were remarkable.  In a video posted to YouTube on October 13, 2019 (the "Techstars Intro video"), Murray appears with Mr. van Haaren and Corey Scheiber (who at the time also was a Deloitte Tax employee) and introduces himself as "the CEO of Prophit.ai."  Given the date it was posted, the Techstarts Intro video was made while Murray was still a Deloitte Tax employee.

54.     The YouTube video makes clear that Prophit.ai's main business focus is to use machine learning to identify sales and use tax overpayments and underpayments – just like CogTax.  In the Techstarts Intro video, for example, Murray explains that "Every year corporations overpay sales and use tax [by] 30 billion dollars and then they hire outside consultants, pay them up to 35% of what they recover in order to identify those overpayments."

55.     Mr. van Haaren then claims that "we spent nights and weekends coding an application that does this work."  Based on public descriptions of the Prophit.ai tool, it competes

directly with CogTax.  Deloitte Tax provides a single-page "CogTax Placemat" to potential clients to explain the tool.  The Deloitte Tax CogTax Placemat describes "The tool improves the process of identifying tax classifications/potential refund opportunities and analyzes and addresses ongoing tax over and under payments, potentially before they occur."  The Prophit.ai Placemat, made publicly available through its LinkedIn account, describes <u>the same exact functionality</u> as that described in the CogTax Placemat used by Murray when he was a Deloitte Tax employee – the use of machine learning to capture and analyze historical data to make taxability determinations and identify tax overpayments and under payments both retrospectively and prospectively.

56.     Prophit.ai advertises on its website a "Taxionary" that ascribes a confidence level to taxability determinations, similar to CogTax's confidence level prediction – a feature non-existent in the marketplace before CogTax:



57.     Coding an artificial intelligence software application that identifies sales and use tax overpayments and underpayments (like CogTax does) competes directly with Deloitte Tax's CogTax offering.  Murray's participation in that coding during his employment with Deloitte Tax directly contravenes Paragraph 6 of the Employment Agreement.

58.     Murray's and Mr. van Haaren's public statements about Prophit.ai were and still are highly troubling because they evidence that Murray, while employed by Deloitte Tax, created and assisted a company that boasted of creating a technology that performs the same function as Deloitte Tax's CogTax, which strongly suggested that Prophit.ai's business model was developed through an improper use of proprietary, confidential, and competitively sensitive information about Deloitte Tax's CogTax product that Murray learned while a Deloitte Tax employee.

59.     These concerns are amplified by the fact that Murray was working on Prophit.ai as its self-described "CEO" while he was still actively employed by Deloitte Tax.  Such conduct clearly violates Murray's Employment Agreement with, and duty of loyalty to, Deloitte Tax.

60.     On February 25, 2020, Deloitte Tax emailed Murray a cease and desist letter identifying the inherent conflict posed by him representing himself as the CEO of Prophit.ai in the Techstars Intro video while he was still employed by Deloitte Tax, demanding that he cease using Deloitte Tax intellectual property, and requesting an inspection of his personal devices and records as permitted by Paragraphs 14 and 22 of the Employment Agreement.

61.     Despite repeated efforts by Deloitte Tax to address this matter and cooperatively identify with Defendant a means by which to address his misconduct short of a lawsuit, Murray has persistently refused to allow Deloitte Tax the inspection provided in the Employment Agreement and has refused to cooperate in getting Prophit.ai to allow inspection of its records to confirm Murray's compliance with the Employment Agreement (as required in Paragraphs 14 and 22 of the Employment Agreement).

**Defendant Murray Further Violated the Employment Agreement**

62.     Following Deloitte Tax's discovery that Murray had founded a competing company, Deloitte Tax identified further conduct by Murray that violates his Employment

Agreement and strongly supports the inference that he built Prophit.ai using Deloitte Tax's property.

63.     For example, Deloitte Tax discovered that, on April 5, 2019, Murray emailed Deloitte Tax's Reverse Audit Checklist from his work account at Deloitte Tax to his personal email account.

64.     The Reverse Audit Checklist is a highly proprietary and confidential document created by Deloitte Tax personnel to assist in identifying and recovering opportunities for potential tax savings for clients.   The Reverse Audit Checklist reflects a compilation of knowledge accumulated over years of experience with Deloitte Tax clients.   The Reverse Audit Checklist would be beneficial to establishing and assisting a business that competes with Deloitte Tax's indirect tax services and more specifically, Deloitte Tax's CogTax product.

65.     There was no permissible work-related reason for Murray to email the Reverse Audit Checklist to his personal email address, which was not used for purposes of his work with Deloitte Tax.  In doing so, Murray violated the express terms of Paragraph 7(c) of his Employment Agreement.

66.     On June 13, 2019, the same month that Mr. van Haaren's Facebook profile claims he and Murray had founded Prophit.ai, and months before Murray informed Deloitte Tax of his intended departure, Murray uploaded a Deloitte Cognitive Tax Insight Client Presentation Deck from Deloitte Tax's private network to an unknown cloud-based platform.  The Deloitte Cognitive Tax Insight Client Presentation Deck is used to explain Deloitte Tax's CogTax services to Deloitte Tax's clients and would be beneficial to establishing and growing a business that competes with Deloitte Tax's indirect tax services and more specifically, Deloitte Tax's CogTax product.

67.     Murray had no permissible work-related reason for uploading Deloitte Tax's Cognitive Tax Insight Client Presentation Deck to an unknown cloud-based platform.  In doing so, Murray violated the express terms of paragraph 7(c) of his Employment Agreement.

68.     On June 17, 2019, Murray uploaded the Deloitte Tax Indirect Tax Analysis Workpaper from its system to an unknown cloud-based site, and, shortly after, printed several unidentified documents from the Deloitte Tax computer network.  The Deloitte Tax Indirect Tax Analysis Workpaper is a compilation of Deloitte Tax's collective knowledge and experience gained over decades of Deloitte Tax client engagements which would be beneficial to establishing and growing a business that competes with Deloitte Tax's indirect tax services and more specifically, Deloitte Tax's CogTax product.  The timing of Murray's printing indicates the documents he printed also likely contained confidential Deloitte Tax information.

69.     Murray had no permissible work-related reason for uploading the workpaper.  In doing so, Murray violated the express terms of paragraph 7(c) of his Employment Agreement.

70.     Upon information and belief, in September 2019, Murray used equipment provided by Deloitte Tax (to be used for work purposes) and his Deloitte Tax-assigned email address to email potential investors regarding Prophit.ai for the purpose of establishing the company's profile in the Northeast Ohio tech business incubator community.

71.     In September 2019, while still employed with Deloitte Tax and while continuing to send Deloitte Tax intellectual property from its system to his personal email account, Murray was actively pitching his competing business to investors.  Prior to or during the first part of September 2019, Murray pitched Prophit.ai to the Innovation Fund Northeast Ohio in a pitch cycle that ended September 15, 2019.  The Innovation Fund Northeast Ohio awards investment funding to technology start-up companies in periodic cycles and is used by companies to promote their

products and services and attract further investment from others.  On December 11, 2019, it was announced that Prophit.ai won $25,000 in that round of funding.  That $25,000 investment, which was obtained while Murray's loyalties were supposed to lay with Deloitte Tax and which, upon information and belief, were sought using Deloitte Tax resources and confidential information, would be beneficial to fund and attract additional investors to a business that competes with Deloitte Tax's indirect tax services.

72.     On September 19, 2020, while Murray was still employed by Deloitte Tax, his company Prophit.ai pitched at a Youngstown Business Incubator and learned that it received an invitation to the Acceleprise incubator program in New York City.  Becoming a participant in the Acceleprise program in New York City, a reward which was obtained while Murray's loyalties were supposed to lay with Deloitte Tax and which, upon information and belief, was applied for using Deloitte Tax resources and confidential information, significantly raises the profile of and provides resources to Prophit.ai that are key to establishing and growing a business that competes with Deloitte Tax's indirect tax services.  This activity violates Murray's Employment Agreement.

73.     Upon information and belief, Murray used his experience with Deloitte Tax to establish his "bona fides" with potential investors while concealing that the idea for Prophit.ai was taken from Deloitte's CogTax tool.

74.     The F6S website is a website for technology start-ups to describe themselves for attracting potential investors.

75.     Murray's      personal      page      on      the      F6S      website,      at https://www.f6s.com/austinmurray2,  and  the  F6S  profile  for  Prophit.ai,  found  at https://www.f6s.com/prophit.ai,  identify  Murray  as  CEO  and  Co-Founder  of  Prophit.ai.   His

personal page states that his time with Prophit.ai began in October 2019 (while he was employed

by Deloitte Tax) and falsely represents that he left Deloitte Tax in October 2019.

76.     Until February 2020, the F6S website profile for Prophit.ai also identified Corey

Schreiber as a co-founder of Prophit.ai.



77.     Mr. Schreiber, who is also Murray's brother-in-law, was employed by Deloitte Tax

from February 17, 2019 until May 2, 2020.

78.     Murray had a non-disclosure agreement with Mr. van Haaren and Mr. Schreiber at

least as early as around October 1, 2019, while he was employed by Deloitte Tax, when he

uploaded the document to Google Drive (a system that he was not authorized to use in his capacity

as a Deloitte Tax professional).

79.     Mr. Schreiber informed Deloitte Tax that Prophit.ai was Murray's company, and that Murray enlisted him to participate in the Techstars Intro pitch video posted to YouTube in October 2019, but that he had ultimately rejected Murray's offer to leave Deloitte Tax to work on Prophit.ai.

80.     As this activity between April 2019 and October 2019 shows, in addition to using Deloitte Tax proprietary documents, equipment and computer systems to establish and promote his competing company in violation of Paragraphs 4, 6, and 7 of the Employment Agreement, Murray was soliciting Deloitte Tax employees to joint Prophit.ai in violation of Paragraph 13 of the Employment Agreement.

81.     As a result of Murray's breaches of the Employment Agreement and other activities described above, Deloitte Tax has been and will continue to be irreparably injured to an extent that cannot yet be fully ascertained.

**Claim 1**

**Breach of Contract Under New York Law**

82.     All prior paragraphs in this Complaint are hereby incorporated by reference.

83.     Murray's Employment Agreement is expressly governed by New York Law.

84.     Murray was provided valuable consideration in the form of employment and remuneration, in exchange for the obligations to which he agreed in the February 26, 2018, Employment Agreement.

85.     Deloitte Tax has performed all conditions precedent to enforcement of the Employment Agreement.

86.     Deloitte Tax has not breached the Employment Agreement in any material way that would excuse Murray's performance of his obligations thereunder.

87.     Murray has, without privilege or excuse, breached the terms of the Employment Agreement, including but not limited to, by: creating and assisting a business while employed by Deloitte Tax that directly competes with Deloitte Tax; using Deloitte Tax's equipment and computer systems for his personal use and benefit; transmitting Deloitte Tax's confidential information to his personal email address and uploading it to a non-Deloitte Tax cloud platform; refusing to allow Deloitte Tax to complete any inspection of his personal computer and other devices to ensure his compliance with the Employment Agreement; refusing to cooperate in allowing Deloitte Tax access to the records of Prophit.ai (which he controls as an owner and the CEO of the company) to confirm his compliance with the Employment Agreement; refusing to assist Deloitte Tax in identifying any Works he created subsequent to the termination of his employment with Deloitte Tax; and soliciting Mr. Schreiber to join Prophit.ai.

88.     Pursuant to Paragraph 8 of the Employment Agreement, any intellectual property, including but not limited to software, developed with Murray's assistance during the period of his employment and in the twelve months after the termination of his employment relating to the actual or anticipated business of Deloitte Tax or any work assigned to him by Deloitte Tax is the property of Deloitte Tax.

89.     Deloitte Tax has been actually and proximately damaged by Murray's breach in an amount to be determined at trial, but in any event including but not limited to its pre-filing costs associated with attempting to investigate and secure his compliance with the Employment Agreement and his illicit profits earned as a result of his breaches of the Employment Agreement.

90.     Murray's breaches of the Employment Agreement, unless he is enjoined and required to specifically perform his obligations – including but not limited to allowing an inspection of his devices, using his best efforts to gain Prophit.ai's cooperation to inspect its

business records, and assigning all *Works* that result from and are related to any work assigned to or performed by him for Deloitte Tax, or that were created using *Deloitte Property* – will continue to cause irreparable harm and damage to Deloitte Tax's business.

## Claim 2

### Breach of Loyalty Under Ohio Common Law

91.     All prior paragraphs in this Complaint are hereby incorporated by reference.

92.     Upon information and belief, since shortly after starting his employment with Deloitte Tax, Murray planned to develop and launch Prophit.ai in direct competition with Deloitte Tax.

93.     Upon information and belief, throughout his employment with Deloitte Tax, Murray emailed, printed, uploaded, and otherwise transmitted for his personal use documents created by and belonging to Deloitte Tax for the purpose of using those documents to develop and launch Prophit.ai.

94.     While employed by Deloitte Tax, Murray helped to develop the directly competitive Prophit.ai platform and applied for third party funding for Prophit.ai.

95.     Murray's faithlessness to Deloitte Tax permeated his employment with Deloitte Tax.

96.     Deloitte Tax has been damaged by Murray's faithlessness as an employee, including but not limited to because it paid compensation to Murray during a period when, instead of being engaged in work for Deloitte Tax, he was engaged in promoting the interests of Prophit.ai.

97.     Murray also must forfeit the compensation paid to him by Deloitte Tax during the period of his faithlessness to Deloitte Tax.

98. Had Deloitte Tax been aware of Murray's competing activities, it would not have continued to employ him.

### Claim 3

### Misappropriation of Trade Secrets Under Ohio Revised Code §§ 1331.61 – 1333.69

99. All prior paragraphs in this Complaint are hereby incorporated by reference.

100. Deloitte Tax's confidential information, including but not limited to: the identity and preferences of clients to whom Deloitte Tax has pitched CogTax and those it intended to approach; knowledge regarding the architecture, functionality, proprietary algorithm, and detailed user preferences behind CogTax; Deloitte Tax's Reverse Audit Checklist; the Deloitte Cognitive Tax Insight Client Presentation Deck; and Deloitte Tax's Indirect Tax Analysis Workpaper have independent economic value because they are or contain information that is not generally known or readily ascertainable by proper means from persons other than Deloitte Tax and give Deloitte Tax an advantage over its competitors and, thus, are Deloitte Tax's highly valuable trade secrets.

101. It would take a person experienced in the reverse audit field and machine learning software coding thousands of hours of work to reach the depth and sophistication of Deloitte Tax's CogTax platform, if they were capable of doing so at all.

102. It would take a person a great deal of trial and error and analysis to develop and optimize the documents created by Deloitte Tax for its internal use and confidential marketing to clients, like Deloitte Tax's Reverse Audit Checklist; the Deloitte Cognitive Tax Insight Client Presentation Deck; and Deloitte Tax's Indirect Tax Analysis Workpaper.

103. Defendant knew that he was not permitted to use Deloitte Tax confidential information, transmit it to his personal email account, or upload it to a cloud server for any purpose other than performing his duties for Deloitte Tax.

104.     Defendant had no permissible work-related reason for transmitting Deloitte Tax confidential information to his personal email account or to a cloud-based platform outside of Deloitte Tax's computing environment, and knowingly breached his duties to Deloitte Tax when he engaged in the activities described above.

105.     Given the similarity between the Prophit.ai software tool and the CogTax software tool, including the advertised use and purpose of the tools and their potential clients, Deloitte Tax believes and on that basis alleges that Defendant has used or is imminently in danger of using Deloitte Tax's trade secrets to develop, promote, and/or advance the interests of Prophit.ai (and Murray, personally), to the disadvantage of Deloitte Tax.

106.     Deloitte Tax has implemented reasonable measures to protect the confidentiality of its information, including but not limited to using security software and passwords to protect its computer systems from unauthorized users, limiting distribution of and access to confidential information to employees that require access to perform their duties for Deloitte Tax using physical and technological means, and entering into written agreements with employees that prohibit the unauthorized use of Deloitte Tax' confidential information and computer systems.

107.     Defendant's misappropriation and threatened misappropriation, as described herein, of Deloitte Tax's valuable trade secrets has caused and continues to cause actual damages to Deloitte Tax, including but not limited to diminution of its goodwill and its business advantages and the costs incurred by Deloitte Tax to investigate the full extent of Defendant's misuse.  Unless Defendant is enjoined, he will continue to cause irreparable harm and damage to Deloitte Tax's business through his misappropriation and threatened misappropriation of Deloitte Tax's valuable trade secrets.

108.    Defendant's misappropriation and threatened misappropriation, as described herein, of Deloitte Tax's valuable trade secrets is willful and malicious within the meaning of O.R.C. 1333.63, thereby justifying punitive damages, and attorney's fees pursuant to O.R.C. 1333.64(C).

## Claim 4

### False Advertising Under the Lanham Act, 15 U.S.C. § 1125

109.    All prior paragraphs in this Complaint are hereby incorporated by reference.

110.    Murray, as the CEO and (upon information and belief) one of two employees of Prophit.ai, creates, controls, and/or is otherwise responsible for and/or has the right and ability to control the marketing messages disseminated by Prophit.ai in interstate commerce.

111.    Prophit.ai uses a variety of methods to promote its products and services in interstate commerce, including but not limited to publicizing the company in media interviews and maintaining a LinkedIn account profiling the company and promoting its goods and services to potential investors and clients.

112.    In at least two instances, Murray has falsely advertised Prophit.ai's products and services in interstate commerce.

113.    In December 2019, Murray falsely advertised Prophit.ai as "the only company offering machine learning software that corrects tax over- and underpayments proactively."

114.    This false statement was repeated in publications found at http://www.glideit.org/news/press-releases/innovation-fund-commits-275-000-to-5-northeast-ohio-startup-companies and https://www.innovationfundamerica.org/news/innovation-fund-commits-275000-5-northeast-ohio-startup-companies.

115.    Upon information and belief, the intent and purpose of Murray's false statement was to position Prophit.ai as the only company to use machine learning software to proactively address tax over and under payments.

116.    At the time he made the statement, Murray knew that Deloitte Tax had innovated the use of machine learning software to correct sales and use tax over and underpayments proactively and he intended to deceive consumers into believing that Prophit.ai was the only company offering such products and services.

117.    Murray's statement that Prophit.ai is "the only company" offering such software was and is literally false.

118.    Upon information and belief, a significant portion of consumers exposed to the false statement are and will be deceived into believing that Murray's statement that Prophit.ai is "the only company" offering such software is true.

119.    Murray's false statement is material because consumers will mistakenly believe that Prophit.ai's software is the only such offering available and be motivated to not look further and choose Prophit.ai's software, despite the fact that Deloitte Tax's CogTax offering preceded Prophit.ai's entry into the field by several years.

120.    On its LinkedIn profile, first used in August 2019 to advertise the company, Prophit.ai also claims:

> Prophit.ai develops machine learning solutions for sales and use tax decision making. Our technology allows us to perform reverse audits 50x faster, and helps clients maintain compliance by solving the taxability problem during purchasing.

121.    Murray's false statements damage Deloitte Tax because they falsely portray Prophit.ai as the sole company offering a machine learning software tool for sales and use tax decision making, falsely portray Prophit.ai as unique in performing reverse audits using machine

learning, and, as a result of these false statements, Prophit.ai is likely to siphon consumers from Deloitte Tax.

122.   Defendant's false advertising, as described herein, has caused and continues to cause actual damages to Deloitte Tax, including but not limited to diminution of its goodwill and its business advantages.

123.   Deloitte Tax is entitled to its actual damages, Defendant's illicit profits, and the costs of this action pursuant to 15 U.S.C. § 1117(a).

124.   Unless Defendant is enjoined, he will continue to cause irreparable harm and damage to Deloitte Tax's business through his false advertising.

125.   Defendant's false advertising, as described herein, is willful and renders this an exceptional case within the meaning of 15 U.S.C. § 1117(a), entitling Deloitte Tax to an award of its attorneys' fees.

**PRAYER FOR RELIEF**

Plaintiff prays that this Court enter judgment against Defendant as follows:

A.   That Defendant be required to specifically perform the terms of the Employment Agreement, including allowing a full investigation of his use of Deloitte Tax property, assignment to Deloitte Tax of any Works belonging to Deloitte Tax pursuant to the terms of the Employment Agreement, and payment of Deloitte Tax's reasonable attorneys' fees and costs incurred enforcing the Employment Agreement;

B.   That Defendant, including all persons to whom he has disclosed trade secrets belonging to Deloitte Tax and all other persons acting in concert with them, be enjoined from further use of Deloitte Tax's trade secrets and ordered to return

and/or destroy all copies of documents reflecting Deloitte Tax's trade secrets in the custody, possession, or control of said persons.

C.      That Defendant, including all persons with whom he is acting in concert, be enjoined from further false advertising of Prophit.ai's products and services.

D.      That Defendant file, within ten (10) days from entry of an injunction, a declaration with this Court signed under penalty of perjury certifying the manner in which Defendant has complied with the terms of the injunction;

D.      That Plaintiff be awarded damages sufficient to compensate it for the damage caused by Defendant's breaches of the Employment Agreement, breach of his duty of loyalty to Deloitte Tax, misappropriation of Plaintiff's trade secrets, and false advertising;

E.      That Plaintiff be awarded Defendant's profits derived by reason of said acts, or as determined by an accounting;

F.      That such damages and profits be trebled and awarded to Plaintiff;

G.      That Plaintiff be awarded its costs, attorneys' fees and expenses incurred in this action pursuant to the terms of the Employment Agreement, O.R.C. §1333.64(C), and/or 15 U.S.C. §1117(a);

H.      The Plaintiff be granted punitive damages for Defendant's malicious acts;

I.      That Plaintiff be granted pre-judgment and post-judgment interest;

J.      That Plaintiff be granted costs associated with the prosecution of this action; and

K.      That Plaintiff be granted such further relief as the Court may deem just.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all triable issues of fact.

Respectfully submitted,

*/s/ Christina J. Moser*
Gregory V. Mersol (0030838)
Email:   gmersol@bakerlaw.com
Christina J. Moser (0074817)
Email:   cmoser@bakerlaw.com
BAKER & HOSTETLER LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, OH  44114-1214
Telephone:   216.621.0200
Facsimile:   216.696.0740

Attorneys for Plaintiff
Deloitte Tax LLP